**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BROKERS' CHOICE OF AMERICA,
INC.; TYRONE M. CLARK,

     Plaintiffs – Appellants,

v.

NBC UNIVERSAL, INC.; GENERAL
ELECTRIC CO.; CHRIS HANSEN;
STEVEN FOX ECKERT; MARIE
THERESA AMOREBIETA,

     Defendants – Appellees.

No. 11-1042

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CV-00717-CMA-BNB)**

---

John J. Walsh of Carter Ledyard & Milburn LLP, New York, New York (Thomas E.
Downey, Jr. of Downey & Murray, LLC, Englewood, Colorado, with him on the brief)
for Plaintiffs–Appellants.

Thomas B. Kelly of Levine Sullivan Koch & Schulz, LLP., Denver, Colorado (Hilary C.
Lane of NBC Universal, Inc., New York, New York; Gayle C. Sproul, of Levine Sullivan
Koch & Schulz, LLP, Philadelphia, Pennsylvania, with him on the brief) for Defendants–
Appellees.

---

Before **BRISCOE**, Chief Circuit Judge, **McKAY**, and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

Tyrone M. Clark and his company, Brokers' Choice of America, (jointly, BCA) sued NBC Universal, Inc. (NBC) and some of its employees (collectively *Dateline*),[1] after it aired a *Dateline*[2] segment titled "Tricks of the Trade." The aired segment featured snippets of Clark taken from one of his two-day seminars for insurance brokers at "Annuity University" located on BCA's property in Colorado. With the assistance of Alabama officials, the *Dateline* crew was able to gain access to BCA's closed seminar. The crew surreptitiously—and according to BCA, illegally—filmed the seminar. Using a mere 112 words from the two-day seminar, the aired program depicted Clark as one who teaches insurance agents how to employ misrepresentations and other questionable tactics in order to dupe senior citizens into purchasing inappropriate annuity products. BCA says Clark's seminars (including the one filmed by *Dateline*), when considered in their entirety, teach and encourage ethical conduct by presenting a balanced approach to saving and investing, and, while touting the advantages of annuities, emphasize that they are not right for everyone. BCA claims *Dateline* used its own "tricks of the trade"— innuendo coupled with very selective editing and commentary—to present Clark's statements out of context in order to create a false impression thereby defaming him. In

---

[1] BCA sued NBC, *Dateline* on-line reporter Chris Hansen, and *Dateline* producers, Maria Amorebieta and Steven Eckert. BCA included General Electric as a defendant because it owns a controlling stake in *Dateline*. The Alabama officials are not parties to this action.

[2] *Dateline* is an NBC weekly news program packaged in a made-for-TV magazine format.

its 42 U.S.C. § 1983 claim, BCA alleges *Dateline* violated its constitutional rights while acting in conjunction with the Alabama officials.

Seemingly, resolution of the defamation claim would not be particularly complicated. The judge or a properly instructed jury could view the *Dateline* segment as aired, compare it to what Clark said over the course of his two-day seminar and decide whether the aired program gave a false impression of his seminar; in other words, whether the segment was not substantially true. Sadly, that was not to be.

*Dateline* moved to dismiss the complaint. It maintained BCA failed to allege sufficient facts to plausibly establish its aired statements were false. It sought to dismiss the civil rights claims because BCA's factual allegations did not demonstrate that the help received from Alabama officials in the production of the program amounted to joint conduct. The court granted *Dateline*'s motion. BCA appealed. It contends the district court failed to credit its allegations as true and improperly made factual determinations to reach its conclusions. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

*Dateline* decided to produce a program exposing fraud in annuity sales to senior citizens. To that end, in mid-2007, *Dateline* producers were assisted by Alabama officials who were investigating the practices used in the sale of annuities to seniors. The officials were members of what came to be known as the Alabama Annuities Task Force, which included representatives from the Alabama Department of Insurance, the Alabama Securities Commission, and the Alabama Attorney General's Office.

Titled "Tricks of the Trade," *Dateline* identified Clark and BCA's "Annuity University" as a training program teaching "questionable tools of the trade." (Appellant's App'x, Vol. I at 57.) The producers wanted to film the training program with hidden cameras. Because only licensed insurance agents may attend Annuity University,[3] Alabama officials agreed to provide false insurance licenses to two of the *Dateline* producers, Maria Amorebieta and Steven Eckert, and listed their names on the national register of insurance agents. In turn, the *Dateline* producers agreed not to sell insurance products and to return the licenses after the investigation. The producers attended and filmed at least part of Clark's two-day October 2007 seminar.

A. The Program

*Dateline* aired "Tricks of the Trade" in April 2008, using the show's signature format. The program opens with Chris Hansen introducing the subject. It proceeds to alternate between hidden-camera footage and studio interviews. The first interview subject was Leo Stulen, a senior who had purchased an equity-indexed annuity[4] without

---

[3] Located on BCA's property in Colorado, Annuity University's seminars are certified for Continuing Education credits by the Insurance Departments of several states. The classes are taught by Clark during a two-day course covering "the technical aspects of annuities and annuity contracts, annuity rules and regulations, and annuities marketing." (Appellant's App'x, Vol. III at 791.) The lecture room has clear postings prohibiting the recording of any portion of the lectures by attendees.

[4] An equity indexed annuity is "[a] special class of annuities that yields returns on your contributions based on a specified equity-based index . . . . Insurance companies commonly offer a provision of a guaranteed minimum return with indexed annuities, so even if the stock index does poorly, the annuitant will have some of his downside risk of loss limited. However, it also is common for an annuitant's yields to be somewhat lower

(Continued . . . )

- 3 -

being told "he would pay stiff surrender penalties" if he needed to withdraw his investment. (Appellant's App'x, Vol. I at 51.) Stulen recounted a time when his wife became ill and they had to withdraw their money. They were required to pay a 15% surrender fee, which forced them to sell their home and choose between buying food or pills. Following Stulen's interview, Hansen states:

> Join us for a ground-breaking hidden-camera investigation, as we go behind the scenes to uncover the techniques they use: inside sales meetings – where we catch the questionable pitches; inside training sessions – where we discover agents being taught to scare seniors; and, finally, inside senior[s'] homes to reveal the tricks some agents use to puff their credentials to make a sale.

(*Id*. at 52.)

Next, *Dateline* shows hidden camera footage of an insurance salesman giving a free "informational seminar" for invited retirees and people approaching retirement. (*Id*.) Hansen is seated in the studio with Joe Borg, the Director of the Alabama Securities Commission. The two men watch a screen displaying the hidden-camera video. Hansen (as narrator) states: "The first step: scare tactics." (*Id*. at 53.) The salesman asks the attendees, *"Does anybody have a guess what the rating is for FDIC? . . . Even though it's backed by the government, it's still F-minus."* (*Id*.) Hansen asks Borg, "Is that a scare tactic?" Borg responds, "Of course it's a scare tactic." (*Id*.)

---

than expected due to the combination of caps on the maximum amount of interest earned and fee-related deductions." (http://www.investopedia.com/terms/indexedannuity (last visited Sept. 10, 2012)).

Hansen then says: "The next step: the big promise." (*Id.*) *Dateline* returns to footage showing the salesman introducing the equity-indexed annuities as a safe investment. The program goes back to Hansen: "Finally: the clincher." (*Id.*) The video shows the salesman promising the account will never lose value. Hansen says, "That's true if you keep your money invested for the length of the annuity, which invariably means years. But Joe Borg says people can lose big if you have to take your money out early." (*Id.* at 54.)

The program moves to a "sting house" in Alabama where *Dateline* secretly filmed local insurance agents attempting to sell annuity products to seniors recruited by *Dateline*. The background narration intones: "There's plenty of talk about what you can gain, but the key question is: will [the agent] tell us about those big surrender penalties if you try to get your money out early?" (*Id.*) After showing footage where the insurance salesman fails to discuss the penalty, the show returns to the studio where Hansen says:

> We've seen some of the tactics insurance agents use to sell to seniors. The agents seem awfully slick. How did they get so good?
>
> You are about to witness something few people have ever seen – a school where, authorities say, insurance salesmen are being taught questionable tools of the trade.
>
> These training sessions are only open to licensed insurance agents.
>
> We don't know whether the salesmen we've met so far studied here, but the state of Alabama agreed to help us investigate by issuing insurance licenses to two *Dateline* producers, so we could attend – and bring along our hidden cameras.

(*Id.* at 57.)

*Dateline* then runs selective footage of Clark's lecture.  It shows Clark stating:

"*[A]nnuities are not liquid?  That is baloney.*"  (*Id*.)  The voiceover introduces Clark as

"the self-proclaimed king of annuity sales" who says "annuities are safe and have no risk,

which are selling points especially appealing to seniors."  (*Id*. at 57-58.)  The camera then

shows Clark saying:  "*What I sell i[s] peace of mind.*"  (*Id*. at 58.)  Shortly thereafter,

Hansen asks:

> But what else is Tyrone Clark teaching?
>
> In 2002, the state of Massachusetts accused Clark and his companies of a "dishonest scheme to deceive, coerce and frighten the elderly."
>
> Part of the evidence was the training manual in which Clark tells agents to sell to seniors by assuming they're "selling to a 12-year-old" and by hitting their "fear, anger or greed buttons."
>
> Clark settled that case without admitting any wrongdoing.
>
> And, now, his company says it's become "an industry leader" in promoting ethical conduct.
>
> But watch what our hidden cameras found, and see if you agree.
> Remember those scare tactics?

(*Id*. at 58.)  Subsequent clips show Clark stating, "And I'm bringing these things up that

disturb the hell out of them"; "I bring out the stuff that – where they can't sleep at night";

"FDIC is insolvent.  FDIC only has $1.37 per every $100 on deposit"; and "I help my

clients to protect their life savings from the nursing home and Medicaid seizure of their

assets.  See, that's scary, and it should be scary."  (*Id*.)

The program suggests that, after alarming seniors, Clark teaches his students to

promise them easy access to their money.  A clip shows Clark saying, "There are more

ways to access your money. There are more options. There are more choices to access your money from an annuity than any other financial instrument." (*Id*. at 59.) Following this statement, Hansen states Minnesota Attorney General Lori Swanson was asked "to watch what our hidden cameras had captured." (*Id*.) In response, Swanson opines, "I think that [Clark] is not telling the truth when he tells those agents that an annuity is the most liquid place a senior citizen can put their money. It is simply not true." (*Id*.)

Hansen then returns to footage of Annuity University showing vendors offering agents the opportunity to place their names as a co-author on a financial advice book, have their picture on the cover of a magazine, or participate as a guest speaker in a pre-scripted radio show and receive compact discs (CDs) of the appearance. Swanson comments: "[Clark] is basically handing them loaded guns so they can walk into the senior's home and rip them off." (*Id*. at 60.) The remainder of the program is primarily hidden-camera footage of an Annuity University student allegedly implementing Clark's lessons to sell indexed annuities and video of another agent who has been the subject of "more than a dozen lawsuits" applying the same tactics. (*Id*. at 64.)

Finally, the program returns to Clark stating, *"That's fear. The presentation should have that impact."* (*Id*. at 68.) Toward the end of the program, *Dateline* returns to Annuity University. They show film of Clark's lawyer declining an interview. Hansen informs the audience, however, that in a series of letters, Clark's lawyers said the quotes from the seminar "were not in full context," and Clark denied *Dateline*'s characterization of his methods. (*Id*.)

B.  The Lawsuit

BCA's complaint alleged several state-law claims:  (1) defamation, (2) trespass, (3) fraud, and (4) intrusion.  It also alleged three violations of 42 U.S.C. § 1983—(1) a Fourth Amendment illegal search and seizure violation and two Fourteenth Amendment violations, (2) invasion of privacy and (3) stigmatization.  *Dateline* moved to dismiss for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  It then moved to stay discovery pending a ruling on its motion to dismiss.  BCA opposed the stay, arguing it needed the unedited footage to substantiate its claims.  Applying Colo. Rev. Stat. §13-90-119(3) (the Colorado Shield Law), specifically the Colorado's newsperson's privilege, the magistrate judge stayed discovery.  The district judge later granted the motion to dismiss with leave to file an amended complaint.

BCA's amended complaint raised only the defamation claim and the § 1983 claims.  Because BCA had not yet received *Dateline*'s hidden camera footage of the October 2007 seminar (Exhibit A to the complaint was reserved for this purpose), the complaint relied on the next best thing, a BCA video recording of Clark's March 28-29, 2007 Annuity University lectures (March seminar).  The purpose of the earlier recording was to provide "substance [of] the true context of the snippets."[5]  (Appellant's App'x, Vol. III at 806.)  The amended complaint was followed by BCA's motion to compel

---

[5] The district court did not view the actual tape of the March seminar.  It relied only on the excerpts provided in BCA's pleadings.

discovery of one item—the unedited hidden camera footage and transcripts of the October 25-26, 2007 lectures.

Claiming the material was subject to the newsperson's privilege established by the Colorado Shield Law, *Dateline* objected to the motion to compel. It then filed a motion to dismiss BCA's amended complaint. The magistrate again denied discovery. Based on the federal common law and the Colorado Shield Law, he concluded that BCA failed to show relevant material was not available from other sources such as the videotape of the March seminar and an affidavit from Clark. BCA objected to the magistrate's decision. It filed an amended brief in opposition to *Dateline*'s motion to dismiss and attached Clark's affidavit.

The district judge affirmed the magistrate's order denying BCA's motion to compel. *See Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, No. 09-CV-00717, 2010 WL 363368 (D. Colo. Jan. 27, 2010) (unpublished). She later dismissed BCA's claims with prejudice. *See Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, No. 09-CV-00717, 2011 WL 97236 (D. Colo. Jan. 11, 2011).

## DISCUSSION

BCA claims the district court erred: (1) by failing to accept its well-pleaded allegations as true; (2) by inappropriately making determinations of fact; (3) by finding BCA did not sufficiently allege state action to support its §1983 claims; and (4) by applying Colorado's newsperson's privilege after BCA demonstrated the relevance and need for the hidden-camera video to support its claims.

A.  Dismissal of Claims

"We review de novo the district court's grant of a Rule 12(b)(6) motion to dismiss." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010).  "'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted.'"  *Id.* (quoting *Miller v. Glanz*, 1562, 1565 (10th Cir. 1991)).  All well-pled factual allegations are accepted as true and viewed in the light most favorable to the nonmoving party." *Id.*

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007) (citations, quotation marks, and alterations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Factual allegations must be enough to raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Our review of the district court's dismissal "for insufficient pleadings does not turn on the controls placed upon the discovery process." *Iqbal*, 556 U.S. at 684-85.

1.  Defamation

BCA alleged its reputation was seriously harmed due to *Dateline*'s malicious or reckless mischaracterization of Clark's statements during his lectures at Annuity

University.  Because this claim arises under diversity jurisdiction, we apply Colorado substantive law[6] which defines defamation as:  "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by publication."  *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 961 (Colo. App. 2009).

"A statement may be defamatory if it tends . . . to harm the reputation of another [so] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Burns v. McGraw–Hill Broad., Co.*, 659 P.2d 1351, 1357 (Colo. 1983) (quotation marks omitted).  "A finding that the language used was defamatory must be predicated on the context of the entire story and the common meaning of the words utilized."  *Id*.  If the plaintiff is a public figure or the statement involves a matter of public concern, the plaintiff has the ultimate burden in his case-in-chief of proving the *falsity* of a challenged statement by "clear and convincing proof."[7] *Smiley's Too, Inc. v. Denver Post Corp.,* 935 P.2d 39, 41 (Colo. App. 1996).

---

[6] "[T]he substantive law of the forum state applies . . . [and] in the absence of authoritative precedent from the [Colorado] Supreme Court . . . our job is to predict how that court would rule."  *Lamb v. Rizzo*, 391 F.3d 1133, 1138 (10th Cir. 2004) (quotation marks and citations omitted).

[7] The district court concluded the *Dateline* program addressed an issue of public concern; BCA does not challenge the conclusion in this appeal.

- 11 -

This heightened evidentiary burden (clear and convincing evidence) requires a plaintiff to demonstrate that the statements were made with actual malice, that is, with knowledge of their falsity or with reckless disregard as to their truth or falsity. *New York Times, Co. v. Sullivan*, 376 U.S. 254, 285-86 (1964); *see also Lockett v. Garrett*, 1 P.3d 206, 210 (Colo. App. 1999). Actual malice can be shown if the defendant entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity. *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1123 (Colo. App. 1992).

"A defendant asserting truth as a defense in a libel action is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting, of the matter is true." *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972). Generally, this is a factual question in which the jury must consider "whether there is a substantial difference between the allegedly libelous statement and the truth; or stated differently, whether the statement produces a different effect upon the reader than that which would be produced by the literal truth of the matter." *Id*. A publisher may be liable "when it takes words out of context and uses them to convey a false representation of fact." *Dixson v. Newsweek, Inc.*, 562 F. 2d 626, 631 (10th Cir. 1977). While statements may appear to be true when viewed in isolation, we consider the entire context to determine if a false impression is projected, "including the medium through which it is disseminated and the audience to whom it is directed." *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1360 (Colo. 1983).

BCA's complaint alleged *Dateline*'s use of a mere 112 words spoken by Clark during two days of lectures grossly misstated the meaning of his words when considered in context and, instead, were manipulated to depict Clark teaching insurance salesmen to prey on seniors. For purposes of this appeal, *Dateline* concedes the substance of its statements is defamatory but contends all the statements were substantially true. (Appellees' Br. at 30, 32.) The district court examined eleven statements taken from the *Dateline* program and statements from *Dateline*'s preview, aired to market the show. The court agreed with *Dateline*.

### a) Substantial Truth

The court dismissed BCA's complaint primarily because it determined the program's statements were substantially true. When "underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law." *Lundell Mfg. Co. v. Am. Broad. Cos., Inc.*, 98 F.3d 351, 360 (8th Cir. 1996); *see Gallo Loeks ex rel. v. Reynolds*, 34 Fed. App'x. 644, 645, 646-47 (10th Cir. 2002) (unpublished) (summary judgment granted when truth of statement conceded). In contrast, BCA disputes the truthfulness of *Dateline*'s characterizations with specific references to portions of its March seminar. The issue, then, is whether BCA's factual allegations, accepted as true, are sufficient to state a plausible claim making "substantial truth" a question of fact for the jury.[8]

_____

[8] Interestingly, *Dateline* cites no case in which a court dismissed a claim prior to discovery on the basis of substantial truth when substantial truth was contested; our own

(Continued . . . )

- 13 -

*b) Factual Allegations*

The gist of the *Dateline* presentation was quite simple: Clark teaches insurance agents to scare and mislead seniors into buying unsuitable insurance products. The judge determined *Dateline*'s statements were substantially true given Clark's statements on the program, including he "disturbs" his potential customers to the point "where they can't sleep at night." (Appellant's App'x, Vol. III at 1176.) The judge further stated, "Clark also urges his attendees to prey on the concerns seniors may have about losing their money to nursing homes" and causes seniors to fear about the security of their money deposited with banks. (*Id*.)

The district judge analyzed each of Clark's statements aired by *Dateline* individually and decided, with respect to each, whether or not it was substantially true. But in a case where a plaintiff asserts a defendant's statements gave a false impression by being presented out of context, a more global approach is required. At trial the aired

---

research has, likewise, produced none. *See Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 118 (2d Cir. 2005) ("'[T]he falsity . . . inquir[y] typically requires discovery.'") (quoting *Church of Scientology v. Behar*, 238 F.3d 168 (2d Cir. 2001)). Under Colorado law, a disputed issue of substantial truth is an issue of fact best resolved by summary judgment after discovery or before a jury. *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1181 (10th Cir. 2007) ("TMJI had no obligation to provide evidentiary support for its allegations, nor did it have an obligation to request that the court convert the motions into ones for summary judgment. When Aetna moved to dismiss the complaint under Rule 12( b)(6), it could not contest the truth of the complaint's factual allegations."); *see also Wilson v. Meyer*, 126 P.3d 276, 283 (Colo. App. 2005) ("'Because the threat of protracted litigation could have a chilling effect upon constitutionally protected rights of free speech, summary judgment is particularly appropriate in defamation actions.'") (quoting *Lockett v. Garrett*, 1 P.3d 206, 210 (Colo. App. 1999)); *Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1361 (Colo. 1983) ("The trier of fact must resolve issues of credibility.").

statements would necessarily be considered as a whole and in the context of all that was said by the narrator and guests in the *Dateline* segment discussing Clark's seminar. Then the aired segment would necessarily be compared to the entirety of Clark's seminar presentation. If that comparison were to clearly and convincingly show the aired statements to have left viewers with a false impression of the gist of Clark's seminars (were not substantially true) he has been defamed by *Dateline*, otherwise he has not. The totality of the circumstances must be considered. *See Burns*, 659 P.2d at 1360 (to determine whether statement is defamatory, "the entire published statement must be examined in context, not just the objectionable word or phrase"); *see also Karedes v. Ackerly Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) ("[a]s to falsity, the accuracy of the report should be assessed on the publication as a whole, not isolated portions of it") (applying New York law, quotation marks and alterations omitted). At the pleading stage, then, we must decide whether BCA alleged sufficient facts, if taken as true, to show the program to have "produce[d] a different effect upon the [audience] than that which would be produced by the literal truth of the matter." *Fry v. Lee*, --- P.3d ---, 2013 WL 3441546, at *4 (Colo. App. 2013).

Clark cannot, and does not, deny the accuracy of the words attributed to him in the *Dateline* segment. In his own words, he brings "out stuff that—where they can't sleep at night" and "I help my clients to protect their life savings from the nursing home and Medicare seizure of their assets. See, that's scary, and it should be scary." (Appellant's App'x, Vol. I at 58.) Semantic differences between "disturb" and "scare tactics" cannot

- 15 -

defeat Clark's unambiguous statement—"That's fear. The presentation should have that impact." (*Id*. at 68.)

However, the program not only accused Clark of using scare tactics. The "gist" or "sting" was his calculated use of these tactics to sell inappropriate products to seniors. While Clark agrees he instructs his attendees to discuss difficult topics with potential customers, including the prospect of nursing-home care and the security of their savings, he alleged, if seen in the entire context of the two-day seminar, he teaches salesmen to approach these issues to determine "the suitability of annuity products for various potential purchasers and how different annuities products may benefit or adversely effect [sic] different individual portfolios." (*Id*. at 791.)

To support this assertion, BCA alleged:

To aid them with suitability issues, agents . . . are taught a list of twenty potential negative aspects of annuities, that can be used in determining whether an annuity is a suitable product for a potential client. Items on the list, among others, include (1) surrender charges, (2) tax considerations, (3) absence of FDIC insurance for annuities, (4) fees, loads and charges, and (5) risks that Medicaid planning may not work. Agents also have to know how to address criticisms of annuities, often false, used by those who sell competitive products . . . .

(*Id*. at 792.)

Clark's typical presentation about banks and the FDIC compares the reserve holding requirements of insurance companies to those of banks and includes the observation that if a bank's reserve holding were evaluated based on the same reserve holding requirements as insurance companies, the bank would likely be considered insolvent. . . . In this vein, Clark also typically teaches agents to advise clients not to keep more than FDIC guarantee limits in a single bank and often distributes a USA Today article explaining the risks of having a single bank hold funds in excess of FDIC guarantees.

- 16 -

(*Id*. at 816-17.)  BCA's complaint also quoted language from the March seminar which immediately preceded a statement similar to one Clark made on *Dateline* about the liquidity of annuities.  Clark explained various types of penalty waivers and access to interest in different types of annuities as prelude to his statement:  "take any other financial instrument, a treasury bill, a mutual fund, you name it, we have more ways to access the money than any other financial instrument."  (Appellant's App'x, Vol. III at 822.)  Moreover, Clark alleged the March seminar shows him strongly recommending agents bolster their credibility by writing newspaper articles or starting a late-night show on a local radio channel discussing financial planning, as opposed to *Dateline*'s characterization that he promotes false credentials by way of ghost-written pamphlets. As to the book referred to on *Dateline*, Clark alleged this book was not in use at the time of the October seminar.  Instead, the book then and now available at Annuity University has one personal chapter written by the agent, and the remainder clearly discloses it is authored by a recognized financial expert.  Finally, the complaint states "the lectures stress [Brokers' Code of Ethics], a set of guidelines drafted by Clark to underscore the importance of ethical business and sales practices in the annuities industry."  (*Id*. at 793.)

In sum, BCA alleged the unedited footage would show Clark teaching the downside of annuities, urging his students to probe into the customer's personal situation to determine the most suitable product, repeatedly telling students annuities are not for everyone, stressing BCA's code of ethics which require full disclosure of various

advantages and disadvantages of annuity products, and promoting personal involvement in the community to gain credibility.

These specific facts, accepted as true and viewed in the light most favorable to the nonmoving party, describe a context substantially different than the "gist" of *Dateline*'s program. Instead of promoting predatory tactics, BCA's complaint alleged facts supporting its position that Annuity University provides a straight-forward discussion of the pros and cons of annuity products and endorses ethical (although scary) marketing. In that light, it plausibly alleges *Dateline* selected bits and pieces of Clark's statements to project an undeserved and shocking image to the audience, leaving it with a false impression of his presentations. Whether these allegations will survive summary judgment remains to be seen. The factual basis of the complaint, however, is sufficient to state a plausible defamation claim. We reverse the district court's dismissal of it.

## 2. Disclosure of *Dateline*'s Unedited Film

We now come to the stay of all discovery while *Dateline*'s motions to dismiss were pending (despite BCA's objections and motion to compel). Our decision reinstating the complaint would normally resolve such a discovery dispute. However, this case is anything but normal. *Dateline* claims it need not disclose its news material merely because BCA plausibly alleged a defamation claim. Rather it argues, under Colorado's newsperson's privilege, Colo. Rev. Stat.

§ 13-90-119(3)(c),[9] as interpreted in *Gordon v. Boyles*, 9 P.3d 1106, 1109 (Colo. 2000), BCA's complaint must also sufficiently plead facts showing "probable falsity" before any disclosure is required.[10] (Appellant's App'x, Vol. III at 981.) *Gordon*'s "probable falsity" requirement cannot apply here.

In *Gordon*, the Colorado Supreme Court considered the application of the statutory newsperson's privilege in a defamation case. Gordon, a police officer, sued several parties after a local radio talk show host, Peter Boyles, made allegedly defamatory comments about Gordon's participation in the stabbing of a fellow officer. The issue was whether Boyles was required to disclose the identities of his confidential sources or whether this information was privileged under § 13-90-119.

The court identified three of the requirements in § 13-90-119 necessary to defeat the privilege: (1) "the news information [must be] directly relevant to a substantial issue involved in the proceeding"; (2) "the news information cannot be obtained by any other

---

[9] § 13-90-119 is reproduced in Appendix A. The statute establishes a newsperson's privilege. Generally it prevents a newsperson from being required to disclose information or sources of information. § 13-90-119(3) establishes the exceptions to the general rule.

[10] The district court also denied discovery based on the federal common law news privilege adopted in *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433 (10th Cir. 1977). Whether news information will be protected depends on a weighing of several factors: (1) "[w]hether the party seeking information has independently attempted to obtain the information elsewhere and has been unsuccessful"; (2) "[w]hether the information goes to the heart of the matter"; (3) "[w]hether the information is of certain relevance"; and (4) "[t]he type of controversy." *Id*. at 438. *Dateline* does not rely on the federal privilege except to the extent it also contains an inquiry into the availability of the evidence from another source.

reasonable means"; and (3) "a strong interest of the party seeking to subpoena the newsperson outweighs the interests under the first amendment to the United States constitution of such newsperson . . . and of the general public in receiving news information." 9 P.3d at 1118.

It concluded Gordon met the first requirement because "the identities of [Boyle's confidential sources] and what they said reflect[ed] directly on the declarant's state of mind with respect to the truth or falsity about the information he broadcast." *Id*. The second requirement, whether the material is unavailable, must be considered from the point of the information's true relevance to the issue of malice. *Id*. at 1119. When evidence of malice may be available other than through the confidential source, the identity of the source should be protected. *Id*.

These first two requirements are easily resolved here. The parties do not dispute the unedited footage taken during the October 2007 seminar is directly relevant to the ultimate issue in this lawsuit—whether *Dateline* maliciously or recklessly mischaracterized the gist of that seminar. And, contrary to *Dateline*'s argument, BCA's video of the March seminar is not an alternative means of acquiring the information necessary to proceed. While the tape of the earlier seminar may have been sufficient to support BCA's complaint, this does not mean it will be sufficient to carry the heavy burden of proof required at trial. According to BCA, "the March video includes only two statements similar to two of the six snippets [used in the *Dateline* program], one addressing liquidity options in annuities and another addressing 'peace of mind.' The

other four October snippets have no counterparts in the March video." (Appellant's Br. at 41.) Therefore, it would be difficult, at best, to compare the totality of the seminar and the gist of *Dateline*'s program without the original video. And it is uncontested the "news information" upon which the complaint is based is solely in *Dateline*'s possession.

Thus, disclosure of the unedited *Dateline* film rests on the third statutory requirement, the balance between the interests of the plaintiff, the newsperson, and the public. It would appear BCA would prevail on this factor as well under *Herbert v. Lando*, 441 U.S. 153 (1979). *Herbert* involved a defamation suit brought by a retired Army officer against Columbia Broadcasting System (CBS) and its reporters. He claimed CBS aired a program that falsely portrayed him "as a liar and a person who had made war-crimes charges to explain his relief from command." *Id*. at 156. The Supreme Court rejected CBS's request for "an absolute privilege to the editorial process of a media defendant in a libel case," concluding it "is not required, authorized, or presaged by [the Court's] prior cases, and would substantially enhance the burden of proving actual malice, contrary to the expectations of *New York Times* . . . and similar cases." *Id*. at 169.

The Court then balanced the "important interests" of an individual's interest in his reputation against the "chilling effect" which may result from the disclosure of the editorial process. *Id*. at 171. After determining the potential chilling effect on the press did not outweigh the individual's interest under the facts of the case, the Court said:

> This is not to say that the editorial discussions or exchanges have no
> constitutional protection from casual inquiry. There is no law that subjects
> the editorial process to private or official examination merely to satisfy
> curiosity or to serve some general end such as the public interest; and if

- 21 -

there were, it would not survive constitutional scrutiny as the First Amendment is presently construed. No such problem exists here, however, where there is a specific claim of injury[11] arising from a publication that is alleged to have been knowingly or recklessly false.

*Id*. at 174.

Although BCA has met the three requirements found in the Colorado statute, *Gordon* added an additional, non-statutory, requirement in its analysis. The Colorado Supreme Court determined that, when considering a request for the identity of a confidential source or for confidential information, "probable falsity" is required to defeat the statutory privilege. It said:

> In sum, the General Assembly adopted section 13-90-119 in order to protect the First Amendment interests of newspersons who rely on *confidential sources* of information to gather and report news about public affairs. However, the privilege is qualified, not absolute. A court must carefully weigh each of the three factors listed in section 13-90-119(3)(a)-(c) before compelling disclosure. As part of the balancing test required under section 13-90-119(3)(c) to weigh the First Amendment interests of a newsperson defendant in resisting compelled disclosure *of confidential sources* and the plaintiff's interest in the information, the trial court must make a preliminary determination about the probable falsity of the defendant's statements. While in some instances disclosure may be the best option, we emphasize that when deciding whether to compel a newsperson to disclose *confidential information*, a trial court should compel disclosure only as a last resort when necessary to promote the effective administration of justice.

9 P.3d at 1121 (emphasis added). Based on the Colorado Supreme Court's decision, *Dateline* claims its news information is not subject to disclosure until BCA has shown

---

[11] In a footnote, the Court noted a "prima facie showing [of a specific claim of injury] could be satisfied by an affidavit or a simple verification of the pleadings." *Herbert*, 441 U.S. at 174 n.23.

"probable falsity." But it ignores the purpose announced in *Gordon*'s holding:

protection of confidential information and sources.

Indeed, *Gordon* expressed concern about "the ability of the press to gather information by promising to keep the identities of their sources confidential" if it was required to identify its sources. *Id*. at 1116. But this is not a case involving confidential sources or confidential information. In essence, *Dateline* wants to pitch the baby out with the bath water. It appears the identity of those who filmed the seminar is well known to the parties, but if undisclosed others were involved, BCA is not seeking to identify them. As for the editorial process, BCA is not seeking any information about how or why *Dateline* decided what portions of the surreptitiously filmed October seminar it would use and what it would not. BCA is only asking for a copy of the unedited film and it would seem to be the only entity with a colorable claim to confidentiality. The application of *Gordon*'s "probable falsity" test in this situation strains credulity. Had Boyles's confidential source in *Gordon* come forward and said "I did not tell Boyles what he said on the radio," surely the test would be satisfied. Clark, the source of the information, says *Dateline*'s statements were false. Why is that not sufficient? What's more, as *Gordon* recognized, "[w]hen the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." *Id*. at 1119 (quoting *Zerilli v. Smith*, 656 F.2d 705, 714 (D.C.Cir.1981)) (quotation marks omitted). *Gordon*'s "probable falsity" inquiry has no place in this analysis.

- 23 -

Without the probable falsity crutch, the equitable balance between "important interests" and "chilling effect" tip dramatically in favor of BCA. The object of discovery—the original footage—is the best and perhaps only evidence from which a fact-finder can determine whether *Dateline*'s portrayal of the substance of what occurred at Annuity University cast Clark's teachings in such a way as to leave a false impression of them. BCA's film from the March seminar will not do. It is not the seminar witnessed by the *Dateline* producers, nor is it the one on which the allegedly false statements in the program were based.

BCA would be greatly prejudiced in its ability to prove the defamation claim without access to the unedited film. *Dateline*'s First Amendment interests do not involve the disclosure of confidential information or confidential sources. The fact-finder is entitled to the best evidence available, particularly in a case like this, which asks whether the media's zeal to report and perhaps sensationalize should be tempered by its responsibility not to defame. For all of those reasons, BCA's factual allegations are sufficient to warrant discovery of the unedited film. The Colorado statue is a shield, not a sword.

### 3. 42 U.S.C. § 1983 Claim

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

To state a claim for relief in an action brought under § 1983, BCA must establish not only the deprivation of a right secured by the Constitution or laws of the United States, but also a deprivation committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Id*. at 50 (quotation marks omitted). "[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 295 (2001) (quotation marks and citations omitted). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

We begin, as we must, "by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 51 (quoting *Blum*, 457 U.S. at 1004). BCA asserts three constitutional violations: (1) unlawful search and seizure; (2) invasion of privacy; and (3) stigmatization. Relying on our decision in *Anderson v. Suiters*, 499 F.3d 1228, 1234 (10th Cir. 2007),[12] the district court dismissed all three claims because

---

[12] In *Anderson v. Suiters*, the plaintiff appealed from the district court's dismissal

(Continued . . . )

BCA "failed to allege facts demonstrating that the State of Alabama and Defendants were joint participants in creating the broadcast Report." (Appellant's App'x, Vol. III at 1187.) The court's approach, however, did not examine each claim separately.

### a) State Action

We reiterate: state, not private, action is an irreducible minimum in a §1983 action. But what constitutes state action? "Quite clearly, a search is not private in nature if it has been ordered or requested by a government official." 1 Wayne R. LaFave et al., *Search & Seizure* § 1.8(b) (5th ed., 2012 update) (citing cases); *see, e.g.*, *United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2008) ("[B]ecause the officers urged the apartment manager to investigate and enter the apartment, and the manager, independent of his

---

of her § 1983 claim against a television news reporter. Anderson alleged she was raped by her ex-husband while she was unconscious and did not learn of the incident until she found a videotape. She brought the videotape to a police officer who assured her the video would be seen only by the officer, his partner, a judge, and a jury. 499 F.3d at 1231. The officer, however, gave an interview to a television reporter and showed her the videotape. The officer agreed to allow the reporter to air the videotape's contents so long as it was limited to the perpetrator's face and was "tasteful." *Id*. The officer then phoned Anderson and, despite Anderson's disinclination to talk to the press, the officer placed the reporter on the telephone. Several days after the story was aired, Anderson filed suit. The district court dismissed the complaint for failure to state a claim.

In affirming, we explained that, to satisfy the state action requirement, the plaintiff must show the private party was a "willful participant in joint action with the State or its agents," *i.e.* conspirators. *Id.* at 1233 (quotation marks omitted). State officials and private parties must "have acted in concert in effecting a particular deprivation of constitutional rights." *Id*. (quotation marks omitted). We noted, "[a]t most, [Anderson's] complaint alleges that the parties had their own, separate goals: [the officer] wanted to appear on camera, and the media defendants wanted exclusive access to the investigation." *Id*. Because Anderson had not alleged the reporter knew of Anderson's confidentiality agreement with the officer, had not alleged the reporter did anything but accept and air the video, and had not alleged the officer had any involvement in the editorial process, she had not shown the reporter and the officer had acted in concert to violate her right to privacy. *Id*.

interaction with the officers, had no reason or duty to enter the apartment, we hold that the manager was acting as an agent of the government."). "A governmental agent may not avoid constitutional restraints upon his conduct by procuring a private individual to perform a forbidden act for him." *United States v. Jennings*, 653 F.2d 107, 110 (6th Cir. 1998). But that is only part of the equation.

If the evidence was not improperly procured by the government, it would not be subject to suppression. *See United States v. Benoit*, 713 F.3d 1, 9 (10th Cir. 2013). Likewise there would be no state action upon which a § 1983 action might be based. *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50. However, if the evidence was improperly procured by an agent of the police, that fact would sufficiently state a Fourth Amendment violation under § 1983. *See United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000) ("[T]he officers twice, within a span of five minutes, attempted to encourage [the UPS agent] to open the package and [the agent] testified that she was influenced by the officers' attempts.").

A search will also be deemed subject to Fourth Amendment restrictions if it is a joint endeavor. "[U]nder the 'joint action' test, . . . we ask whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013) (quotation marks omitted). In looking for concerted activity the devil is in the details. Whether the landlord was acting at the behest of the police, for his own purpose (to get rid of a pesky

tenant or minimize a costly methamphetamine clean-up), or with mixed motives, is a fact intensive inquiry not unlike many others courts must resolve.

> [A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on **fact-intensive**, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123–125, 120 S. Ct. 673, 145 L.Ed.2d 570 (2000) (whether an officer has reasonable suspicion to make an investigative stop and to pat down a suspect for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)); *Robinette*, 519 U.S., at 39–40, 117 S. Ct. 417 (whether valid consent has been given to search); *Tennessee v. Garner*, 471 U.S. 1, 8–9, 20, 105 S. Ct. 1694, 85 L.Ed.2d 1 (1985) (whether force used to effectuate a seizure, including deadly force, is reasonable).

*Missouri v. McNeely*, 133 S. Ct. 1552, 1564 (2013) (emphasis added).

In looking at concerted or joint activity, we use a "two-step inquiry to determine whether a search by a private individual constitutes state action." *Benoit*, 713 F.3d at 9. We ask (1) "whether the government knew of and acquiesced in the private person's intrusive conduct," and (2) "whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Id*. (quotation marks and alterations omitted). "Both prongs must be satisfied considering the totality of the circumstances before the seemingly private search may be deemed a government search." *Id*. (quotation marks omitted). "'[K]nowledge and acquiescence . . . encompass the requirement that the government agent must also affirmatively encourage, initiate or instigate the private action.'" *Id*. (quoting *United States v. Smythe*, 84 F. 3d 1240, 1243 (10th Cir. 1996)).

BCA alleged the *Dateline* producers, acting under color of state law, engaged in an unreasonable search and seizure when they used the false credentials supplied by

Alabama officials to enter BCA's property and surreptitiously videotape the seminars. When considering this claim, we are not concerned whether Alabama officials were involved in the editorial process leading to the defamation claim. We only examine the factual basis for the claim that Alabama and *Dateline* acted jointly to conduct a warrantless search and seizure of BCA's seminar. At this stage of the lawsuit, BCA need only plead sufficient facts to plausibly state joint action between the Alabama officials and *Dateline*.

Alabama officials and *Dateline* were both interested in investigating fraudulent sales of annuities to seniors. At some point BCA's Annuity University became a matter of interest in the concurrent investigations. *Dateline* wanted to surreptitiously film BCA's seminar for its broadcast, but only licensed insurance agents were allowed to attend. Alabama officials were interested in the investigative potential of filming the seminar. A deal was struck. Knowing the producers would use hidden cameras to record the seminar, Alabama officials supplied the *Dateline* producers with false credentials they could not otherwise obtain. *Dateline* agreed to share the information it obtained with the Alabama officials. *Quid pro quo*. The Alabama officials entered into a contract in which Alabama acknowledged each *Dateline* producer "has received a . . . License from the State Department of Insurance to be used solely for the purpose of an investigation." (Appellant's App'x, Vol. III at 842-43.) Alabama officials entered the fraudulent credentials into a national database which would defeat inquiry into the status of the producers' credentials. The producers used the Alabama credentials to gain entry for an

- 29 -

investigation with the knowledge and support of the Alabama officials. Finally, *Dateline* shared the information with officials, as intended, to further Alabama's investigation. The question is whether the marriage of convenience resulted in a constitutional violation.

### b)  Fourth Amendment Violation

*Dateline* says there is no Fourth Amendment violation when officers or their agents enter a private place under false pretenses. Generally speaking and on these facts, we agree. For purposes of our analysis we consider *Dateline* to have been either an agent of the Alabama officials or sufficiently engaged in concerted activity with them to meet the joint action test. We look first to the deception enabling *Dateline* to gain access to the seminar and then at its surreptitious and prohibited recording of the presentations.

The general rule is that government agents may use deception to gain access to homes, offices, or other places wherein illegal acts are being perpetrated. The Supreme Court has long acknowledged the use of trickery or deception to be permissible in the detection of crime. *Lewis v. United States*, 385 U.S. 206, 208-09 (1966); *Sorrells v. United States*, 287 U.S. 435, 441-42 (1932) ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises."). "A ruse by law enforcement officers to influence behavior is not prohibited unless it is unconstitutional." *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1184-85 (10th Cir. 2006). "Because Dunlap's actions would not have been a seizure if he had identified himself as a police officer, the ruse did not violate

- 30 -

Ojeda–Ramos' constitutional rights." *Id.* at 1185. The ruse in *Ojeda-Ramos* was undertaken to see if, in response, the suspect would provide inculpatory evidence.[13] Ruses take many forms. Sometimes, as in *Ojeda-Ramos*, to elicit a response from a suspect. Sometimes to lure a suspect to the door so that he might be arrested. *Id.* at 1182. But often a ruse is used to gain entry to a place or mislead a suspect as to the identity or purpose of a police officer or cooperating police operative. There are limits, of course,[14] but misrepresentation of official capacity is not generally one of them. If total honesty by the police were to be constitutionally required, most undercover work would be effectively thwarted by a simple question, "Are you in any way affiliated with the police?" In general, what is revealed to another, even if unwittingly, is not entitled to constitutional protection. *See Lewis*, 385 U.S. at 212. And so it is here.

---

[13] The case cites other examples of constitutionally benign ruses by the police, which cause a suspect to incriminate himself.

[14] Notwithstanding the legality of searches conducted by undercover agents, the "Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area." *Hoffa v. United States*, 385 U.S. 293, 301 (1966). In gaining permission to enter a home in order to search, the police may not falsely claim to have a search warrant. S*ee Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). That particular falsehood essentially coerced the consent to search, making it involuntary. Likewise, ATF agents may not falsely claim to have a tip that an apartment contains bombs and drugs which they must investigate. *United States v Harrison*, 639 F.3d 1273 (10th Cir. 2011). That, too, vitiates consent. *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) ("An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'") (quoting *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993)).

*Dateline* misrepresented its employees as insurance agents, implicitly denying they were agents of Alabama investigatory agencies. But, there were no coercive acts, only implicit lies about their actual identity and purpose. We see that as no different from an undercover police officer misrepresenting himself as a drug dealer. BCA makes much of the fact that Alabama provided false credentials, enabling the charade. But that is not unlike any of the myriad steps law enforcement agencies regularly take to embellish the false identity and credentials of undercover operatives. BCA willingly, albeit unwisely, admitted the *Dateline* personnel it encountered to the seminar. That is sufficient consent whether it involved state actors, agents of state actors, or joint action among state and private actors.[15]

We now turn to the scope of BCA's consent. It claims any consent, improvident or otherwise, was limited by its prohibition on recording the seminars. That may be true for a breach of contract or some common variety tort but it does not pass muster under Fourth Amendment jurisprudence. Several Supreme Court cases and cases from this circuit have decided no Fourth Amendment violation occurs when a government agent or informant makes an audio or audiovisual recording of conversations with defendants,

---

[15] In cases where "the police misrepresentation of purpose is so extreme," a person is "deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy," and therefore the resulting "consent should not be considered valid." Wayne R. LaFave et al., *Criminal Procedure* § 3.10(c) (3d ed. 2007). The depths of proscribed ruses has probably not been fully plumbed, but of this we are sure: it does not include claims by the police, their agents or confederates to be licensed insurance agents in order to infiltrate a sales seminar held in a business property.

even when the defendants do not consent to the recording of the conversation (invited informer doctrine). As the Supreme Court explained in *Katz v. United States*, 389 U.S. 347, 351 (1967), "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Objects observed or statements uttered in "the 'plain view' of outsiders are not 'protected' because no intention to keep them [private] has been exhibited." *Id.* at 361 (Harlan, J., concurring). In *Hoffa v. United States*, 385 U.S. 293, 302-03 (1966), the Supreme Court held statements knowingly exposed to government informants are not protected under the Fourth Amendment because "[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

Likewise, the surreptitious recording of statements is not violative of the Fourth Amendment if the statements were exposed to the public or made in the presence of outsiders. In *Lopez v. United States*, 373 U.S. 427, 437-40 (1963), the Supreme Court decided no Fourth Amendment violation occurred where an Internal Revenue Service agent "gained access to the [defendant's] office by misrepresentation" and recorded a conversation with the defendant. And in *United States v. White*, 401 U.S. 745 (1971), government agents were allowed to testify regarding a conversation between a government informant and the defendant, which the agents overheard by using radio equipment concealed on the informant. The Supreme Court has said, "[i]f the conduct

and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *Id.* at 751. Relying on *Hoffa* (quoting *Lopez*) and *White*, this Court in *United States v. Longoria* decided there was no Fourth Amendment violation when a government informant recorded a conversation with a defendant who "knowingly made incriminating statements in the informant's presence." 177 F.3d 1179, 1183 (10th Cir. 1999).

*Lopez, White*, and *Longoria* all hold there is no Fourth Amendment violation when government agents or informants surreptitiously record conversations. These cases do not require the defendant's consent to the recording of conversation. Rather, it is sufficient if the electronic recording device "was carried in and out by an agent who was there with the petitioner's assent, and [the device] neither saw nor heard more than the agent himself." *Lopez*, 373 U.S. at 439. "This principle applies with equal force to statements knowingly exposed to government informants." *Longoria*, 177 F.3d at 1182 (citing *Hoffa,* 385 U.S. at 302-03).

Application of the invited informer doctrine is less clear when media defendants are involved. In *Wilson v. Layne*, 526 U.S. 603, 605-06 (1999), the Supreme Court

- 34 -

decided police officers violated the Fourth Amendment when they invited the media along to observe and record the execution of an arrest warrant in a private home.[16]

On the same day the *Wilson* decision was announced, the Court also addressed a decision from the Ninth Circuit. In *Berger v. Hanlon*, 129 F.3d 505 (9th Cir. 1997), the Ninth Circuit decided federal officers were liable under the *Bivens*[17] doctrine for permitting media representatives to ride along and document events as a search warrant was being executed in the Bergers' home and elsewhere on their ranch. It also decided the Bergers had stated a § 1983 claim against the media representatives because they were government actors. It addressed the "invited informer" or "misplaced confidence" doctrine by holding it did not apply to the media representatives because their surreptitious video and audio recordings did not further a law enforcement purpose. *Id*. at 513. The Supreme Court issued a Writ of Certiorari upon the petition of the federal defendants to address a narrow issue: the liability of federal agents for permitting the media to document the events for no police purpose. Relying on *Wilson*, the Supreme

---

[16] The holding was quite explicit: "We hold that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id.* at 614. In *Wilson*, "[T]he reporters did not engage in the execution of the warrant, and did not assist the police in their task. The reporters therefore were not present for any reason related to the justification for police entry into the home—the apprehension of Dominic Wilson." *Id.* at 611. The Court offered no opinion as to whether evidence developed by the media representatives could be suppressed. *Id.* at 614 n.2.

[17] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

- 35 -

Court concluded the Bergers' complaint stated a Fourth Amendment claim against the federal officers. *Hanlon v. Berger*, 526 U.S. 808, 809-10 (1999). None of the other issues decided by the Ninth Circuit were addressed. The Supreme Court has left us with nothing to suggest the invited informer ought not to be applicable in this case.

In both *Wilson* and *Hanlon*, government agents were using the coercive power of government to gain access to citizens' homes. In exercising that coercive power, the government agents invited the press along for no legitimate police purpose. Nothing comparable occurred here. No government actors were present and the *Dateline* operatives neither represented themselves to be government officers nor demanded entry on behalf of the government. At worst, it is a classic case of government agents sending willing and available operatives to obtain information freely revealed to those operatives. The fake insurance agent credentials supplied by Alabama officials fit easily into the types of deception courts have generally found permissible because it involved no coercion, express or implied. It is, instead, the classic ruse of misrepresented identity. Moreover, according to BCA's allegations and the available facts of record, the Alabama officials facilitated the ruse for a legitimate investigative purpose. *Dateline* may have violated state tort law, but no actionable Fourth Amendment violation occurred.

*c) Substantive Due Process–Right to Privacy*

BCA also alleged *Dateline* violated its right to privacy, under color of state law, when the producers entered BCA's premises and secretly recorded the lectures. However, "the *federal* constitution . . . protects against public disclosure [of] only highly personal matters representing the most intimate aspects of human affairs." *Nunez v.*

*Pachman*, 578 F.3d 228, 231-32 (10th Cir. 2009) (quotation marks omitted). BCA did

not allege disclosure of information which could be deemed "personal." Thus, the

district court correctly dismissed this claim.

### d) Procedural Due Process–Stigmatization

"'Where a person's good name, reputation, honor, or integrity is at stake because

of what the government is doing to him, a protectible liberty interest may be implicated

that requires procedural due process in the form of a hearing to clear his name.'" *Gwinn*

*v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (quoting *Wisconsin v. Constantineau*,

400 U.S. 433, 437 (1971)). "Damage to one's reputation alone, however, is not enough

to implicate due process protections." *Id*. The plaintiff must demonstrate:

> (1) the government made a statement about him or her that is
> sufficiently derogatory to injure his or her reputation, that is capable of
> being proved false, and that he or she asserts is false, and (2) the
> plaintiff experienced some governmentally imposed burden that
> significantly altered [his or] her status as a matter of state law.

*Id*. (quotation marks omitted).

Since government action is critical to a due process claim, BCA was required to

allege how the Alabama officials took joint action with *Dateline,* not only in planning the

search and seizure of BCA's seminar, but also in the editorial process leading to the

statements aired on the program. The only facts alleged in its complaint on this point

were (1) the presence of Joseph Borg, Director of Alabama's Security Commission, as a

commentator on the show, and (2) Borg's personal friend made an appearance as a

potential "victim" at the sting house. We agree with the district court: these facts are not

sufficient to infer editorial participation in the allegedly defamatory content.

- 37 -

## CONCLUSION

We AFFIRM the district court's dismissal of BCA's Fourth Amendment claim as well as its § 1983 privacy and stigmatization claims.  We REVERSE the dismissal of the defamation claim and REMAND for further proceedings consistent with this judgment.

**CRS 13-90-119.** Privilege for newsperson

(1) As used in this section, unless the context otherwise requires:

(a) "Mass medium" means any publisher of a newspaper or periodical; wire service; radio or television station or network; news or feature syndicate; or cable television system.

(b) "News information" means any knowledge, observation, notes, documents, photographs, films, recordings, videotapes, audiotapes, and reports, and the contents and sources thereof, obtained by a newsperson while engaged as such, regardless of whether such items have been provided to or obtained by such newsperson in confidence.

(c) "Newsperson" means any member of the mass media and any employee or independent contractor of a member of the mass media who is engaged to gather, receive, observe, process, prepare, write, or edit news information for dissemination to the public through the mass media.

(d) "Press conference" means any meeting or event called for the purpose of issuing a public statement to members of the mass media, and to which members of the mass media are invited in advance.

(e) "Proceeding" means any civil or criminal investigation, discovery procedure, hearing, trial, or other process for obtaining information conducted by, before, or under the authority of any judicial body of the state of Colorado. Such term shall not include any investigation, hearing, or other process for obtaining information conducted by, before, or under the authority of the general assembly.

(f) "Source" means any person from whom or any means by or through which news information is received or procured by a newsperson, while engaged as such, regardless of whether such newsperson was requested to hold confidential the identity of such person or means.

(2) Notwithstanding any other provision of law to the contrary and except as provided in subsection (3) of this section, no newsperson shall, without such newsperson's express consent, be compelled to disclose, be examined concerning refusal to disclose, be subjected to any legal presumption of any kind, or be cited, held in contempt, punished, or subjected to any sanction in any judicial proceedings for refusal to disclose any news information received, observed, procured, processed, prepared, written, or edited by a newsperson, while acting in the capacity of a newsperson; except that the privilege of nondisclosure shall not apply to the following:

(a) News information received at a press conference;
(b) News information which has actually been published or broadcast through a medium of mass communication;
(c) News information based on a newsperson's personal observation of the commission of a crime if substantially similar news information cannot reasonably be obtained by any other means;
(d) News information based on a newsperson's personal observation of the commission of a class 1, 2, or 3 felony.

(3) Notwithstanding the privilege of nondisclosure granted in subsection (2) of this section, any party to a proceeding who is otherwise authorized by law to issue or obtain subpoenas may subpoena a newsperson in order to obtain news information by establishing by a preponderance of the evidence, in opposition to a newsperson's motion to quash such subpoena:
(a) That the news information is directly relevant to a substantial issue involved in the proceeding;
(b) That the news information cannot be obtained by any other reasonable means; and
(c) That a strong interest of the party seeking to subpoena the newsperson outweighs the interests under the first amendment to the United States constitution of such newsperson in not responding to a subpoena and of the general public in receiving news information.

(4) The privilege of nondisclosure established by subsection (2) of this section may be waived only by the voluntary testimony or disclosure of a newsperson that directly addresses the news information or identifies the source of such news information sought. A publication or broadcast of a news report through the mass media concerning the subject area of the news information sought, but which does not directly address the specific news information sought, shall not be deemed a waiver of the privilege of nondisclosure as to such specific news information.

(5) In any trial to a jury in an action in which a newsperson is a party as a result of such person's activities as a newsperson and in which the newsperson has invoked the privilege created by subsection (2) of this section, the jury shall be neither informed nor allowed to learn that such newsperson invoked such privilege or has thereby declined to disclose any news information.

(6) Nothing in this section shall preclude the issuance of a search warrant in compliance with the federal "Privacy Protection Act of 1980", 42 U.S.C. sec. 2000aa.